**CM, a minor by and through her parents JM and EM, and on their own behalf, Plaintiffs,**

**v.**

**THE BOARD OF PUBLIC EDUCATION OF HENDERSON COUNTY a/k/a Henderson County Schools; Dan G. Lunsford, Ed.D., Superintendent; Linda R. Hawk, Chairman; Jackie H. Hornsby, Vice Chairman; Ervin W. Bazzle; Brenda O. Brock; Allen A. Combs; Thomas E. Orr; Thomas B. Pryor; and Judy Diane Hartman Cook, in their official and individual capacities, Defendants.**

No. CIV 1:98CV66.

United States District Court, W.D. North Carolina, Asheville Division.

Feb. 1, 2002.

468

Shelli J. Lewis, Lewis & Lewis, Corona, CA, Andria C. Knight, Governor's Advocacy Council for Persons with Disabilities, Morganton, NC, Paul Lawrence Erickson, Law Firm of Paul L. Erickson, P.A., Asheville, NC, Pauline F. Laubinger, N.C. Advocacy Council for Persons with Disabilities, Raleigh, NC, for plaintiffs.

Louise Paglen, Ann L. Majestic, Tharrington Smith, Raleigh, NC, for defendants.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the remand from the United States Circuit Court of Appeals for the Fourth Circuit. *CM ex rel. JM v. Board of Educ. of Henderson County*, 241 F.3d 374 (4th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 48, 151 L.Ed.2d 18 (2001).

## I. PROCEDURAL HISTORY

JM and EM on behalf of CM, their autistic[1] child, initiated this action in February 1999 pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400, *et seq.*, claiming the Henderson County Board of Education (County) had denied a free appropriate public education (FAPE) to their child. 20 U.S.C. §§ 1401(a)(1)(A)(i), 1401(a)(18).[2] Plaintiffs filed two petitions for contested case hearings before the North Carolina Office of Administrative Hearings. In the first petition, filed in June 1996, Plaintiffs sought reimbursement for the cost of ob-

---

1. For the purposes of the IDEA, autism is "a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences." 34 C.F.R. § 300.7(c)(1)(i).

2. That section defines the term "free appropriate public education" as "special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title."

taining an Independent Educational Evaluation (IEE) of their child. On November 1, 1996, Plaintiffs filed a second petition seeking reimbursement for Lovaas[3] therapy provided to CM during the 1993–94, 1994–95 and 1995–96 school years and placement of CM with Lovaas therapy for the 1996–97 school year. The petitions were consolidated by Chief Administrative Law Judge (ALJ) Julian Mann who, on March 24, 1997, granted partial summary judgment to the County on Plaintiffs' claim for reimbursement for the IEE in excess of the sum of $1,200. He also ruled that all claims prior to the 1996–97 school year were time-barred. On December 11, 1997, ALJ Meg Scott Phipps found the County had offered to provide the child with a FAPE as required by federal and state law for the 1996–97 school year.

Plaintiffs filed an administrative appeal and State Review Officer (SRO) Joe Walters affirmed the ALJs' decisions on March 4, 1998. Having exhausted their administrative remedies, the parents brought this action pursuant to the IDEA. 20 U.S.C. § 1415(e)(2). By Order filed June 16, 1999, the undersigned granted partial summary judgment to the Defendants finding that a letter sent to the Plaintiffs on February 16, 1995, by Judy Cook, the County's Director of Programs for Exceptional Children, constituted proper notice for statute of limitations' purposes under the IDEA and N.C. Gen.Stat. § 115C–116 for the 1995–96 school year. In addition, Plaintiffs' claims pursuant to the Rehabilitation Act, the Americans with Disabilities Act, 42 U.S.C. § 1983, and the Fourteenth Amendment to the Constitution as well as all claims asserted against the individual Defendants were dismissed.

Plaintiffs' claims for the school years 1997–98 and 1998–99 and for punitive damages were also dismissed. On October 12, 1999, the undersigned found the County had offered CM a FAPE for the 1996–97 school year and the Plaintiffs had not stated a cause of action pursuant to N.C. Gen.Stat. § 115C–106.[4]

Plaintiffs appealed to the Fourth Circuit Court of Appeals which ruled (1) the North Carolina statute of limitations provides the most analogous limitations period within which to request an IDEA due process hearing, affirming the trial court; (2) the 60–day limitations period mandated by the North Carolina legislature for requesting a due process hearing is not inconsistent with the federal policies contained in the IDEA, affirming the trial court; (3) the February 1995 letter from Judy Cook did not sufficiently notify the parents of the commencement of the 60–day limitations period, reversing the trial court; (4) a FAPE was offered to CM for the 1996–97 school year, affirming the trial court; (5) Plaintiffs could not recover for the IEE in excess of $1,200, affirming the trial court; and (6) the basis for the trial court's ruling that proper notice was provided for the school years 1993–94 and 1994–95 was unclear, thus, the matter was remanded for further proceedings including a determination of whether the claims for those years were barred for other reasons. *CM, supra.*

## II. STANDARD OF REVIEW

Title 20, United States Code, § 1415(e)(2) provides in pertinent part that in "any action brought under this [statute] ... [the court] basing its decision on the

---

**3.** Applied behavioral analysis therapy is "a form of treatment for autistic preschoolers developed by Dr. Ivar Lovaas [which] consists of breaking down activities into discrete tasks and rewarding the child's accomplishments."

*Jaynes v. Newport News Sch. Brd.,* 13 Fed. Appx. 166, 170 n. 3 (4th Cir.2001).

**4.** "The policy of the State is to provide a free appropriate publicly supported education to every child with special needs."

preponderance of the evidence, shall grant such relief as the court determines is appropriate." The Supreme Court has held that a proper review of the state's determination requires a twofold inquiry. *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 201, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The district court must decide: (1) whether the State complied with the IDEA's procedural requirements in developing and implementing the Individualized Education Program (IEP) for the child at issue and (2) whether the IEP is "reasonably calculated" to enable that child to receive educational benefits. *Id.*, at 206–07, 102 S.Ct. 3034. The Fourth Circuit refined this standard in *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100 (4th Cir.1991), where it held that findings of fact by ALJ's and hearing officers in IDEA cases "are entitled to be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." *Id.*, at 105. In essence, district courts must "make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings." *Board of Educ. of Montgomery County v. Brett Y*, 155 F.3d 557 (table), 1998 WL 390553 *5 (4th Cir.1998) (citations omitted). However, the reviewing court should bear in mind that "the touchstone of IDEA is the actual provision of a free appropriate public education." *Sellers v. School Bd. of City of Manassas, Va.*, 141 F.3d 524, 527 (4th Cir.1998).

In conducting this review, the district court may not "substitute [its] own notions of sound educational policy for those of local school authorities." *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir.1997). Indeed, the dis-

trict court must defer to the SRO's credibility determinations. *Doyle, supra.* And, the SRO must defer to the credibility determinations made by the hearing officer because he or she had the opportunity to hear the testimony. *Id.*, at 104. Finally, the burden of proof of establishing a violation of the IDEA falls on the party challenging the administrative findings. *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir.1991).

## III. STATEMENT OF FACTS

Plaintiff JM has averred that in

July of 1993, our family moved to Hendersonville, North Carolina to have C[M] evaluated and enrolled in the "Helping Hands" TEACCH [5] class in the Hendersonville County Public Schools. [ ] An Initial Individualized Education Program (IEP) was completed for C[M] on August 23, 1993 after which C[M] began her TEACCH class.

Affidavit of [JM], dated February 27, 1997, *included in* Section II of the Administrative Record (footnote added). Before CM could be enrolled, the County was required to perform an evaluation of CM, a process for which the parents' consent was required and obtained. 34 C.F.R. § 300.500. A TEACCH evaluation was prepared for the child on July 27, 1993, by the Asheville TEACCH Center. Respondents' [Defendants'] Exhibit 46. Three different tests showed that CM functioned at a developmental age of 18 months at that time. Defendants' Exhibit 71, Letter from Anne McGuire, TEACCH Consultant, dated August 17, 1993. CM's parents agreed that the testing fairly reflected her skills. *Id.* CM was to be enrolled in the Helping Hand Developmental Day Care program and would also attend between six to eight

---

5. Treatment and Education of Autistic and Related Communication Handicapped Chil-

dren program.

sessions at the TEACCH center in order to obtain "more information about how [CM] learns...." *Id.*

CM did attend eight sessions at the TEACCH center. Defendants' Exhibits 158 and 159. A home program was also developed for her so that her parents could reinforce what she was learning at school. Defendants' Exhibit 160. A detailed description of the teaching sessions which CM would attend at TEACCH was included in the evaluation which contained a section noting the parents' participation in the evaluation and agreement therewith. Defendants' Exhibit 46, *supra; accord,* Petitioners' [Plaintiffs'] Exhibit 2, Notebook 1, Bates Nos. 8605–06. Throughout the program, the Helping Hand teacher received assistance from Sloane Burgess, a TEACCH consultant. Defendants' Exhibits 161–164. Burgess had specific suggestions for CM, such as learning the difference between independent work areas where she would work alone as opposed to working with her teacher. *Id.,* at Defendants' Exhibit 161. CM's introduction to her daily schedule was also explained as a "[l]eft to right work system with finished basket. Photograph schedule given to her 2 pictures at a time. She will match the photograph to a pocket with the same photograph...." *Id.* Because CM had difficulty remaining in the play area during play time, her play time was scheduled to include several types of play for short time periods. *Id.,* at Defendants' Exhibit 162. Her transition between different tasks was to be accomplished by handing her a picture paired with a verbal directive such as, "time to work." *Id.*

The IEP provided that CM would attend preschool at the Helping Hand Developmental Day Care using TEACCH methodology for 34 hours per week and receive speech therapy for one hour per week. Defendants' Exhibit 2. Because the preschool was located within an elementary school, part of each day CM would be mainstreamed into a class with non-disabled children. *Id.* As is required, specific goals were set for the child and evaluation procedures were described. *Id.* CM's parents signed this IEP thus approving of her placement in the autistic preschool program. Plaintiffs' Exhibit 2, Notebook 2, Bates Nos. 9509–12. On November 23, 1993, a second evaluation of CM was completed by the TEACCH psychologist. Plaintiffs' Exhibit 2, Notebook 1, Bates Nos. 402–04. At that time, CM was almost four years old and had a mental age of about three years of age. Defendants' Exhibit 48. Her diagnosis of autism was reiterated and she also received a diagnosis of borderline intellectual functioning. *Id.*

After only three months in the TEACCH program, CM's parents "concluded it was necessary to try an alternative educational approach [ ] and withdrew [CM] from the [ ] TEACCH class. By letter dated November 23, 1993, ... [JM] notified [the County] of our decision to remove C[M]...." Affidavit of [JM], *supra.* The day before CM was withdrawn from the program, JM met with Candy Priest, the Exceptional Children's Coordinator for the County. JM told Priest he was pleased with the TEACCH program but had learned about a new behavioral modification therapy which he wanted to try. Testimony of Candy Priest, Transcript Vol. XI, at 127. JM did not make any criticism of CM's class or her teacher and the only request made was for continued speech therapy. *Id.,* at 130. In his letter to Priest, JM requested that the County continue to provide speech therapy for CM and to prepare an amended IEP to provide increased hours of therapy, although he acknowledged that the County was not legally required to do so. Defendants' Exhibit 72, Letter from JM to Candy Priest, dated November 23, 1993. In

January 1994, this request was accommodated.[6] Transcript Vol. XI, at 130–32.

Judy Cook, Director of Programs for Exceptional Children for the County, also acknowledged that the County "agreed to continue to provide C[M] with speech services and an IEP meeting was held in February 1994 to update C[M]'s speech goals. The other aspects of the IEP remained in effect; however, the [parents] chose to keep C[M] at home in their own program." Exhibit A, Affidavit of Judy Cook, *attached to* [County's] Brief in Support of Summary Judgment, filed February 26, 1997, *included in* Section II of the Administrative Record.

The next contact between the County and the Plaintiffs occurred in June 1994 when Priest observed CM during her Lovaas therapy in her home. Transcript Vol. XI, at 133–34. During a period lasting one hour and 45 minutes, CM had nine incidents of tantrums or screaming. Defendants' Exhibit 180. Most of her responses to the Lovaas therapist were elicited through prompting. *Id.* In early September 1994, JM met with Priest to obtain copies of portions of CM's file. Transcript Vol. XI, at 142–44. During this meeting, Priest told JM the County would still be interested in providing services to CM. *Id.* One of the services offered was to work with CM at her current Montessori preschool. *Id.* However, JM declined, saying that he had not told the preschool that CM was autistic. *Id.* During a discussion with Priest in December 1994, JM asked if the County would contribute in the future to the cost of CM's Lovaas therapy. *Id.,* at 145. He advised that the cost of the therapy had been $35,000 during 1994 and wondered if the County would pay the same amount as they had paid for the Helping Hand Developmental Day Care.

Defendants' Exhibit 182. During this meeting, Priest reminded him that CM's annual IEP review was coming up in January 1995. Defendants' Exhibit 183; Transcript Vol. XI, 145–50. At the January meeting, the parents were told the County remained willing to enroll CM or provide services to her at her private preschool. *Id.* The options included a return to the Helping Hand TEACCH program, a morning program at one of two elementary schools, or serving CM in her day care program or at home. Defendants' Exhibit 183. The parents "were adamant about [CM] not being identified as a special needs student at her day care. They had not told her teacher, [ ], that she is autistic—only that she has a communication disorder." *Id.* They were unwilling to enroll CM or to accept in-home services. *Id.*

Priest testified,

Over and over again it just kept coming back that—that, yes, we were proud of [CM's] academic skills, but what she absolutely had to do was use these skills and use her language to communicate functionally.... We were finding that C[M] could—could respond to a prompt, but that was—I mean, every time we saw her, someone had to say, "C[M], say hello," ... [T]here was always someone there with her, either guiding, moving her or ... it was always a prompt and then expecting a response. And we in education know that's not—that's not how we—how we learn or how we progress or how we—how we survive in society.

Transcript Vol. XI, at 150–51.

In fact, the parents came to the IEP meeting with their own proposed IEP that "referred I believe on every page to the Lovaas methodology. And I believed that

---

6. In fact, at the time of the hearing in 1997 the County continued to provide speech ser-

vices to the child. Transcript Vol. XI, at 142.

it was more important to focus on the goals and objectives that we wanted C[M] to be able to accomplish and not to debate methodology and not to put methodology into the IEPs, that methodology should be something that was selected or implemented by the classroom teacher who had C[M].... " Testimony of Judy Cook, Transcript Vol. VI, at 192. In fact, the parents' draft IEP specifically provided for Lovaas therapy, containing goals such as, "With one-on-one assistance *from a trained Lovaas behavioral therapist ...*" on each page thereof. Defendants' Exhibit 5 (emphasis added).

On February 15, 1995, the County forwarded to the Plaintiffs the final IEP for the time period February 16, 1995, through January 5, 1996. Defendants' Exhibit 6. The IEP provided that CM would be enrolled for 20 hours per week in the self-contained autistic classroom at Bruce Drysdale Elementary with main-streaming into regular classrooms, resources in the regular school program, such as library and physical education, occupational therapy for 30 minutes per week and speech therapy for 2 hours per week. *Id.* Despite several conferences, the parties were unable to agree on an IEP.

The Lovaas methodology was developed by Dr. Ivar Lovaas as a result of a three-year study conducted of 19 children who were diagnosed as autistic. Plaintiffs' Exhibit 10, "Behavioral Treatment and Normal Educational and Intellectual Functioning in Young Autistic Children," by O. Ivar Lovaas. All of the children were aged three or under and received 40 hours per week of one-on-one instruction in their home. *Id.* At the end of the study, nine of the children had achieved normal IQ's and were described as indistinguishable from their peers. Eight were placed in aphasic (communication handicapped) classes and

the remaining two were in autism or special education classes. *Id.*

Dr. Jacqueline Wynn is the director of the Lovaas Institute and testified as an expert in the use of Lovaas therapy to treat autistic children.[7] Lovaas therapy is one version of Applied Behavioral Analysis (ABA) which "consists of breaking down activities into discrete individual tasks and rewarding the child's accomplishment. The child eventually learns to integrate the information and associate instruction with a given activity." *Mr. X v. New York State Educ. Dept.*, 975 F.Supp. 546, 548 n. 1 (S.D.N.Y.1997); Transcript Vol. XIII, at 71. Discrete trial teaching is one aspect of the program and involves a prompt to the child followed rapidly with a consequence based on whether the child gives the appropriate response. *Id.; TH v. Board of Educ. of Palatine Community Consol. Sch. Dist. 15,* 55 F.Supp.2d 830 (N.D.Ill. 1999). In the Lovaas program, when a child has negative behavior, the therapist analyzes why and in what context it is happening. Transcript Vol. XIII, at 27–28. This allows the therapist to determine the reason behind the behavior, such as seeking attention, and to predict when it will occur. *Id.* Then, the therapist devises an intervention plan, a plan to stop the behavior. *Id.,* at 29. So, for example, if the behavior is occurring because the child is frustrated by a task, it may be that the task is too difficult and therefore, needs to be broken down. *Id.,* at 30.

The Lovaas program designs a treatment package for the child which begins with 40 hours per week of one-on-one instruction in the child's home. *Id.,* at 45. Later, more and more of the time is spent in a socialization setting of school, peer play and community activities. *Id.* An essential component of the program is the involvement of the parents in the therapy

7. She was not accepted as an expert in the     disease of autism.

so that any gains made by the child with her therapist are not lost. *Id.*, at 45–46. The parent is expected to help the child generalize the skills learned during therapy to the everyday world. *Id.*, at 75. According to Dr. Wynn, a major difference between Lovaas therapy and other treatments for autistic children is that intervention in the Lovaas program begins at the preschool versus school age. *Id.*, at 49.

The program also uses a therapy log which provides continuity among the therapists and aides involved. *Id.*, at 96. It is used to record behavior, skills and problem areas. *Id.* It becomes a record of what a child knows and does not know. *Id.* The program has an hierarchy of goals in different categories which are to be mastered. *Id.*, at 160. Once a skill is mastered, the child is moved on to a new one. *Id.*, at 102. If he or she regresses, the therapist goes back to the last skill. *Id.*, at 105. The ultimate goal is for the child to generalize the skills learned in therapy. *Id.*, at 103. Thus, drills are used to teach the children. The Lovaas program relies on prompts to ensure that the child acquires a skill and remains successful with it. *Id.*, at 121–22. "But the goal is to start with the prompt and then fade out the prompt and get rid of it so the child is working independently." *Id.*, at 122. Successes are reinforced, usually by physical contact or food. *Id.*, at 37. Eighty percent of the Lovaas program focuses on the development of language skills. *Id.*, at 110. Typically, the program begins around age three and continues until seven or eight. *Id.*, at 135. On cross-examination, Dr. Wynn testified that the TEACCH program also begins at preschool age and relies on heavy parental involvement. *Id.*, at 181.

Dr. Lee Marcus is the clinical director of the TEACCH Center in Chapel Hill, North Carolina. Transcript, Vol. XIX, at 6. The TEACCH program creates a classroom environment for autistic children which is predictable and therefore understandable. *Id.*, at 76. Structure is very important to autistic children because they cannot handle numerous stimuli at once. *Id.* The physical space of their classroom is arranged in a manner that explains to the child what will happen in different parts of the learning program. *Id.*, at 77. Thus, the autistic child, who has strong visual skills, is able to rely on those skills to feel comfortable with the setting. *Id.*, at 78. The program also relies on structure in the form of a daily schedule because autistic children have difficulty understanding the concept of time. *Id.*, at 79. The daily schedule is presented to the child according to each child's abilities. *Id.*, at 80. Thus, some may be written and others may rely on color cues. But the purpose of the schedule is to allow the child to know in detail what will occur at each portion of the day. *Id.*, at 81. This is done because autistic children do not understand the concept of sequencing and become very anxious about what will occur next in their day. *Id.*, at 82. Each child has an individual work system which is designed to help the child become independent in carrying out his assignments. *Id.*, at 83. Within this work system are four questions for each child to integrate during his assignment: What am I supposed to do?; How long will the work last?; How do I know when I am finished?; and What comes next? *Id.*, at 84. The program uses visual cues as well as teacher directives. This increases independence and reduces frustration caused by an inability to understand auditory directives. *Id.*, at 89. Like Lovaas therapy, TEACCH allows the child to learn one task which has been broken into its simplest parts before going on to a more difficult task. *Id.*, at 98.

Another aspect of the program involves teaching language and communication

skills because "[w]hat distinguishes children with autism from other language handicapped people is not so much the words, although a lot of kids have great difficulty learning words, it's using those words in a social context to communicate naturally, spontaneously, and meaningfully." *Id.*, at 106. This requires having the child learn and understand that communication involves two or more people since autistic children are self-contained. *Id.* The first goal is to get communication going in any form as long as there is a connection between the child and the teacher or peers. *Id.*, at 109. This requires an assessment of the child's current skills in order to know how to elicit spontaneous communication. *Id.*, at 111. Usually this is done by involving the child in an activity which interests him, such as a picture exchange in which the child names the object. *Id.*, at 112–13.

The TEACCH method does not use behavior modification to deal with behavior problems because that method is a consequential approach. *Id.*, at 121. Instead, it uses behavior management which means that, based on the child's individual needs, the environment is structured to prevent problems. *Id.* Despite these measures, if the child exhibits aggressive or self-injurious behavior, a new assessment is done. *Id.*, at 122. It may be that too much is being expected of the child or it may be necessary to use a consequential approach in close proximity to the behavior. *Id.* Many behavior problems in autistic children, as with normal children, are alternative forms of communication. *Id.*, at 123. They are signs of stress or frustration. *Id.* So, for example, rather than placing a child in a "time out" each time he kicks, he will be rewarded each time he does not kick. *Id.*, at 124. But the root of the solution is a determination of why the behavior occurs. *Id.*, at 125. Only in this manner can you eliminate the need for the behavior rather than simply suppressing the behavior itself. *Id.* A child may behave with tantrums if he or she is frustrated at a task, the task has been going on too long, or it is too difficult. *Id.*, at 125–30. Although some people call it a form of task avoidance, one must understand why the child wants to avoid the task in order to understand the cause of the behavior. *Id.*

Dr. Marcus feels that TEACCH differs from Lovaas philosophically, strategically and in the manner in which success is measured. *Id.*, at 139. The Lovaas methodology views autism as a collection of aberrant behaviors which may be controlled by an intensive behavior/discrete trial teaching approach. *Id.*, at 140. TEACCH views each autistic child as having individual differences. *Id.*, at 142. "[W]hile you can improve on them and help and move people along in some cases to the point that they might be indistinguishable from normal, [TEACCH] doesn't really [ ] accept the notion that everything is fixable and that autism is merely a collection of unusual behavior or behaviors and deficits." *Id.* Moreover, TEACCH provides a predictable environment to enable the child to become independent by learning. *Id.*, at 145. The Lovaas approach uses the "the one-to-one adult-initiated process and because of what autism is, and the fact that people with autism are potentially prompt dependent that what happens is that the person with autism becomes dependent on the adult who is doing the teaching." *Id.* They become dependent on verbal cues rather than learning to integrate cues by using their visual skills. *Id.* Lovaas also has a pre-designed curriculum which is imposed on the child, rather than a curriculum designed for that specific child. *Id.*, at 147. However, TEACCH uses developmental psychology to ensure that the child "crawls before he walks" rather than teaching the child to walk when he does not understand the

concept of crawling. *Id.*, at 151. Another difference between the two · programs is the use in the Lovaas program of high school and college graduates as the therapists after they have been trained at the Lovaas Institute. *Id.*, at 154. "This is a very complex disorder, and people who are engaged in a clinical enterprise or an educational enterprise need to have good— they need to have a lot of knowledge in a lot of areas. And even then—even with that, you need specialized training and ongoing support." *Id.* It is also important that the learning occur in the classroom, as opposed to the child's home, because "[l]earning must go on in the context in which it can be generalized." *Id.*, at 158. One-on-one instruction is used in the TEACCH classroom but not to the exclusion of other methods of instruction. Many parents become concerned that their child will develop inappropriate behavior from the other children in the class. *Id.*, at 179. However, autistic children have difficulty imitating behavior; therefore, if the child is at such a level of development that she is capable of imitation, there are other methods of working with her to avoid the problem. *Id.*, at 180.

CM's Lovaas therapy began in early December 1993 after her parents withdrew her from the TEACCH program. Thus, for the 1993–94, 1994–95 and 1995–96 school years, she was in Lovaas therapy coupled with private pre-school. Log books were kept by CM's therapists for each therapy session and she received therapy seven days a week for a total of 40 hours per week. Each therapy session lasted for two to three hours, usually occurring early in the morning, in midday and late in the afternoon for three sessions per day. Categories of developmental skills were taught by "drills" which were repeated until CM succeeded. Among the categories for the 1993–94 school year were such skills as non-verbal and verbal imitation, receptive and expressive object labels, receptive and expressive body parts, object retrieval, colors, shapes, animal sounds, people identification, emotions, opposites, pronouns, personal · information and locations. Among the categories for the 1994–95 school year, in addition to the previous year's, were prepositions, "listen to a story," pronouns, why, sequencing, describe, taste, phonics, rhyming, "tell me a story," conversation, math, telling time and toy play. These, and more advanced, categories were continued into the 1995–96 school year.

A separate set of notes was made for CM's performance at school; however, no such notes were found for the time period prior to December 1994. [CM's] Therapy Log Book, UCLA, Book 6, Bates Nos. 5479–97. A Lovaas therapist was with her at all times while she was at the Montessori preschool. *Id.* By January 1995, CM engaged in parallel play alongside other children and moved "from center to center when I [the therapist] initiate move but does not usually move on her own." *Id.*, at No. 5481. By the middle of February, she would spontaneously move to a different center when another child caught her eye. *Id.*, at 5483. CM consistently responded to other children with smiles and often answered "yes" to her teachers. *Id.*, at 5484. She willingly followed other children to different centers and lined up with the class to go to the bathroom. *Id.*, at 5485. The therapist continued to work on getting CM to interact with the other children but, in April of 1995, she still had bad days when it was necessary to remove her from the classroom due to self-stimulation or screaming. *Id.*, at 5490–93. Although she was only in pre-school for one hour every other day, she liked going and was often sad to leave. *Id.* By the end of the year in May, she sometimes spoke to other children but still required prompting for speech interaction. *Id.*, at 5497.

CM began her 1995–96 school year in September 1995. On the first day of school, her Lovaas therapist noted that because CM was used to communicating within a two-foot distance, she had difficulty "hearing" in a group setting. C[M]'s Therapy Log Book, UCLA Book 6, Bates No. 7384. The therapist also thought that prompting should not occur as frequently during the school setting. *Id.*, at 7385. CM had some difficulty with socialization skills, such as wanting to take home a toy and having a tantrum when the therapist told her she could not. *Id.*, at 7386. Her Lovaas "shadow" expressed concern over "where to intervene and where to try to wean her from cues." *Id.*, at 7388. Frequently the therapist found it necessary to rearrange the teacher's question in order for CM to understand it. *Id.*, at 7390. And CM continued to have trouble attending to the teacher's directions to the entire class, causing the therapist to prompt her. *Id.*, at 7398. This was especially true during field trips. *Id.*, at 7403. She also had trouble listening to more than one child during play time. *Id.*, at 7414. It became clear that CM needed to be exposed to more advanced language in order to relate to the other children. *Id.* There were occasional incidents of temper tantrums, at least once involving kicking another child by accident. *Id.*, at 7420, 7432, 7437, 7439, 7441, 7446, 7448. Her biggest challenge was the required activities. "It's not that C[M] doesn't want to do or doesn't like the activities, she just doesn't like (a) being told to do them (b) having to give up a more attractive activity to do them and (c) they change everyday so she has a hard time finding a pattern." *Id.*, at 7445. By November 1995, behavioral problems such as tantrums and self-stimulation had made the other children frightened of her and they were no longer interacting well with her. *Id.*, at 7449, 7452, 7454, 7458, 7462. Language continued to be "way over her head." *Id.*, at 7450. After working hard to control the tantrums for a few weeks, the other children began to approach CM again. *Id.*, at 7457. In December, she had begun to notice when her friends were not in class. *Id.*, at 7469.

By January 1996, it was obvious that CM craved interaction with the other children, whom she would approach but then did not know what to say. *Id.*, at 7476. Her shadow continued to prompt her, sometimes frequently. *Id.*, at 7479. "C[M] just doesn't know what to say when playing." *Id.* When the class went to library, many of the stories were still too advanced for her. *Id.* Self-stimulation occurred from time to time. *Id.*, at 007481. By the end of January, she had begun to approach other children and ask them to play or to answer a question. *Id.*, at 007486. CM clearly enjoyed group activities although her language interaction was weak in that area. *Id.*, at 7487. Her shadow began using a stern response when CM screamed during class but didn't "know if it's decreasing her screams in total." *Id.*, at 7489. However, her therapist noted that when CM really wanted something, she was capable of asking with a loud voice in full sentences. *Id.*, at 7490. It was also noted that "[c]utting off her screaming and tantrum introductions is working well in school, as is bribeing (sic)." *Id.*, at 7493. Although her therapist was confident that CM could respond to the directions posed by the teacher, she had trouble responding to the "quick and natural language." *Id.*, at 7499. Nonetheless, by March, her spontaneous language had greatly improved. *Id.*, at 7512. In April, her Lovaas therapist noted that CM needed to learn to hear and integrate complex directions delivered from the teacher, as opposed to the therapist, and to gain independence. *Id.*, at 007542. She was heavily dependent on prompts from the therapist and although she was very interested in the activities of the other children, she

did not know how to participate. *Id.,* at 7543. And, throughout the spring, she was still having tantrums in class. *Id.,* at 7548, 7556, 7566–67, 7573. Her therapist was concerned that she did not initiate interaction with other children unless prompted to do so. *Id.,* at 7571. In early May, it was noted that "since C[M] has 'come back' from her non-vitiman (sic) zone days, all the children and both teachers are speaking to her like she were any other child." *Id.,* at 7572. Her therapist wrote in mid-May that she was "really trying to pull back when [CM] can do things on her own and she is not stimming or playing 'in her own world.'" *Id.,* at 7578. CM continued to have good and bad days until the end of the school year.

Beginning in December 1993, CM had three different therapists each day administering the Lovaas therapy. Even on the days she attended school, CM still had three sessions of therapy per day. There are references throughout the exhibits to CM's day beginning as early as 4:30 a.m. Among the many categories recorded by the therapists was general behavior reported from November 1993 through the end of the 1996 school year. Frequent references to her fatigue during therapy are recorded. Therapy Log Book, Chicago Program, Book 1, Bates Nos. 2252, 2255–57, 2259, 2262, 2264–66, 2268, 2272, 2281, 2296–97, 2304, 2308, 2312, 2317, 2332; Therapy Log Book, UCLA Book 7, Bates Nos. 5770–71, 5780–81, 5784–85, 5798. Although therapy was broken up with "play time," CM would often fall asleep during that time. *Id.* It was also noted that early in the program she was "prompt dependent" which meant she had become dependent on the receipt of candy as an inducement to perform a task or a reward for task completion. Therapy Log Book, Chicago Program, Book 1, at Bates Nos. 2253, 2258. If candy was not used, the therapist had to use physical prompts, such as carrying her to her chair or fanning her with

cards to hold her attention between tasks. *Id.,* at 2254, 2261. Self-stimulation was a problem throughout therapy and was, at times, seen as a means to avoid completing or performing a particular task. *Id.,* at 2257–62, 2266–68, 2270–75, 2278–84, 2287–300, 2302–04, 2306–10, 2314–15, 2317–20, 2324, 236, 2328–33. By the end of January 1994, her therapist noted that she was finally having sustained eye contact with him. *Id.* She performed well for one therapist in particular, Marty, who noted progress and the use of less candy as a reward. In February 1994, one of her therapists noted that CM was "very tired of doing these drills." *Id.,* at 2270. CM had begun to talk and enjoyed it so much that at times it was hard to get her to settle down to work. *Id.,* at 2274. Later, her verbalizations were often characterized as self-stimulation. Some of the therapists appeared to rely on prompts more than others, *i.e.,* "if I say candy she will easily come sit back down, if not I have to bring her to her seat." *Id.* As would be expected, CM did better in therapy sessions held earlier in the day. *See, e.g., id.,* at 2276. In mid-March 1994, CM started to hit herself but stopped and looked at Marty instead. *Id.,* at 2285. This was a sign of knowledge that the behavior was inappropriate. Marty also reported that in the middle of April 1994, CM had begun to identify the objects of a photograph by looking at the printing on the back of the photograph before turning it over to see the picture. *Id.,* at 2292. In May, she began to directly communicate with her therapist by saying things such as "I don't want to" instead of having a tantrum. *Id.,* at 2304. Prompting continued to be used in June 1994 although Marty noted candy was used only during the last hour of the session. *Id.,* at 2316, 2326, 2336. By August 1994, CM would say, "I sad" when asked to begin her work drill. *Id.,* at 2336–37, 2340. She began to ask for candy

in response to prompts to perform a certain drill. *Id.*, at 2341. Self-stimulating behavior continued through the end of 1994, especially when CM did not want to continue a particular drill or was tired. *Id.*, at 2342; Therapy Log Book, UCLA Book 7, Bates Nos. 5768–78, 5781, 5783–85, 5787, 5789, 5791, 5793–97, 5802, 5805, 5812–13, 5815–16, 5831. Although CM had made academic progress, reports of tantrums became frequent in late August 1994 and continued through the end of the year. *Id.*, at 5768, 5778–79, 5783–84, 5788, 5794–806, 5834–35, 5840–41, 5844. Prompting by the reminder of a reward of candy was still necessary. *Id.*, at 5768–71, 5778–81, 5783, 5789–90, 5795, 5796. However, it was clear that CM made differentiations because when her mother ran out of a certain kind of candy, she told her therapist, "I want real Skittle." *Id.*, at 5792. By mid-October 1994, CM's hitting and kicking of both herself and her therapists had become severe enough to warrant being put into the extinction category. *Id.*, at 5807–08, 5810–11, 5814, 5821, 5827, 5838. Although her hitting continued, especially self-hitting, she now said "no hitting" at times after having done so. *Id.*, at 5819–20.

The second half of the 1994–95 school year was similar to the fall. CM continued to enjoy pre-school but also continued to self-stimulate and to hit either herself or her therapist during times of frustration. *Id.*, at 5861, 5863. However, her responses now consisted of more than one word. *Id.*, at 5823. When a therapist prompted her to become frustrated in order to evoke language, CM told the therapist "bye." *Id.*, at 5824. Her spontaneous language was increasing. *Id.*, at 5826. Yet, self-stimulation was noted during almost every session. *Id.*, at 5864–90. By March 1995,

CM would listen to Marty's answer to a question and then ask another question without prompting. *Id.*, at 5905. Tokens had replaced candy as a prompt or reward. Although self-stimulation continued, by the end of March, CM had more good sessions than bad. *Id.*, at 5905–27. Her therapists noted at times that she was tired and they felt guilty for waking her up to work. *Id.*, at 5934, 5961. Her spontaneous language was much improved. *Id.*, at 5942.

CM's therapy continued all summer. In the fall of 1995, her spontaneous language was much better although tantrums and self-stimulation continued. *Id.*, at 6046–67, 6055. She expressed herself better to her therapists, noting that she liked school. *Id.*, at 6050. However, she still had periods of being "zoned out" which seemed to occur several days in a row followed by several days of energetic work. Numerous references continue to the fact that she was tired during therapy. *Id.*, at 6056–58 ("[CM] fell asleep 3x this session."), at 6063 ("She drew a . . . face like mine but added tears. I asked her what was wrong and she said she was tired."). This pattern of energy followed by fatigue and behavior problems continued throughout the school year.

The 1995–96 IEP would have placed CM, who was almost six years old, in Laurie McDanel's classroom for autistic children at the Bruce Drysdale Elementary School. The classroom had approximately five students. Testimony of Laurie McDanel, Transcript Vol. X, at 18. Other autistic children who were in regular classrooms received instruction in McDanel's classroom for about one hour per day, and one day each week, two fourth graders from a regular classroom came into her classroom as a means of reverse mainstreaming and to teach socialization skills.[8]

---

8. Ms. McDanel described her classroom at the time of the hearing in 1997. However, her testimony and other evidence indicated that she had followed a similar pattern in previous years.

*Id.,* at 19. McDanel, who was assisted by two teacher's aides described a typical day in her classroom. The students arrived around 8:00 a.m. *Id.,* at 42. A student who was learning to write sentences would go to the library each morning where he used the computer. *Id.,* at 42–43. Another student began his day by doing independent work because it helped him settle into the routine. *Id.,* at 44. A third student would be in the play area; the fourth would be doing independent work. *Id.,* at 45. Data was kept on each child and when the teacher and aides rotated, they discussed each child's accomplishments and goals. *Id.,* at 50. If a child's IEP required it, a daily anecdotal log was kept and each child who was mainstreamed into a regular classroom had a daily log. *Id.,* at 54. Each child received one-on-one instruction with McDanel each day. *Id.,* at 59. While the students worked independently, they were monitored by an aide. *Id.,* at 64. Each morning the children had time on the playground. *Id.,* at 69.

McDanel felt the environment of the room was important because autistic children are easily distracted. *Id.,* at 150. In addition to independent work time and one-on-one instruction, times were allotted for communication and social skills development. *Id.* McDanel would find an area of interest to each child and then begin to build a personal relationship with her based on that interest, thus teaching the child to communicate. *Id.,* at 151. By having the classroom environment comforting to the children, they were able to adjust to the changes in their daily schedule, making the transition between tasks and different times of the day. *Id.* This allowed them to transfer these skills beyond the classroom. *Id.,* at 152. Also, it freed them from fear and confusion and allowed them to learn. *Id.,* at 152–53. Each week in the play area, they introduced different scenes, such as camping sites, to promote interest in the children

and encourage spontaneous communication. *Id.,* at 155. If CM had come into the class, a third teacher's aide would have been hired. *Id.,* at 28, 115.

McDanel testified that tantrumming is the beginning level of communication for autistic children and as soon as they have a system to communicate, the tantrums decrease. *Id.,* at 194. They are allowed to use pictures or other methods to communicate their needs and then the behavior usually ceases. *Id.* "I rarely have anybody tantrumming, because academically they're learning." *Id.* Tantrums are a sign, not that the child is lazy, but that he or she is sick, hungry, tired, or frustrated. *Id.,* at 195. She has never had a child functioning well enough to be mainstreamed into a regular classroom who also is having tantrums. *Id.,* at 195–96.

## IV. DISCUSSION

In the opinion remanding this case, the Fourth Circuit noted:

> The basis for the district court's holding in *CM* that school authorities provided notice with respect to the 1993–1994 and 1994–1995 school years is unclear. It appears that the district court may not have actually resolved this issue, focusing only on the notice provided as to the 1995–1996 school year. We remand this issue to the district court, expressing no view on whether notice complying with the statute was provided in the earlier years. We also note that although the ALJ found CM's parents' claims for reimbursement in the 1993–1994 and 1994–1995 school years barred for additional reasons, the district court did not address these reasons . . . .

*CM,* 241 F.3d at 388 n. 12. The Court therefore directs its attention to this mandate.

■ Bearing in mind that the Plaintiffs seek reimbursement for Lovaas thera-

py for all three school years, "[r]eimbursement of special education expenses under IDEA is appropriate when the reviewing court finds that: (1) the public school's placement was not providing the child with a free appropriate public education; and (2) the parents' alternative placement was proper under IDEA." *Jaynes ex rel. Jaynes v. Newport News School Bd.*, 13 Fed.Appx. 166, 172 (4th Cir.2001). In determining whether a FAPE has been provided, the Court should consider whether the state has complied with the IDEA's procedural requirements in developing and implementing the IEP and whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. Thus, in order to resolve the issue of whether the Plaintiffs are entitled to reimbursement, it must be determined first, whether the County was obligated to provide due process notice for the 1993–94 and 1994–95 school years and second, whether the County provided a FAPE for all three school years.[9]

█ Due process notice was not sent to the parents during either the 1993–94 or 1994–95 school years. The issue, then, is whether the County was obligated to provide due process notice to the parents in the following factual scenario: (1) at the parents' request, the school system prepared an IEP for CM for the 1993–94 school year; (2) CM was enrolled in the system based on that IEP which had been approved by the parents; (3) three months later, the parents unilaterally and without notice removed her from the school system; (4) the removal was not based on any complaint or dispute pending with the school system but on the parents' unilateral decision to try a new type of therapy not available at the school; (5) at the parents' request, the school system continued to provide speech therapy at County expense; (6) the parents met with the school district employees in January 1994 and an IEP was prepared for the 1994–95 school year which continued speech therapy; (7) no objection was raised to the IEP for either school year; and (8) in December 1994, for the first time, the parents asked for contribution toward future therapy but still raised no complaint or objection to the IEP's.

In the administrative proceeding, the County moved for summary judgment, claiming that the parents' claims for all school years prior to the 1996–97 school year were time-barred. At a hearing before ALJ Mann on February 27, 1997, the parents' attorney acknowledged that he had failed to timely serve affidavits in opposition to the County's motion for summary judgment. Transcript of Hearing before Administrative Law Judge Julian Mann, III, February 27, 1997, at 85. Rather than granting the County's motion to strike the affidavits, the ALJ determined to continue the hearing on the motion. *Id.*, at 88. However, the parents' attorney asked for a recess in order to discuss the continuance with his clients. *Id.*, at 90, 93. At the conclusion of the recess, counsel advised the Court, "I'm going to withdraw my motion to continue and I would ask that we just go ahead and proceed with the motion for summary judgment, *and I realize I won't have any affidavits* and it will be primarily dealing with the issues of law that we're dealing with and affidavits filed on behalf of opposing counsel." *Id.*, at 93 (emphasis added). Later, in response to the argument pre-

---

**9.** The Circuit has ruled that the February 1995 letter did not constitute a due process notice for the 1995–96 school year. Thus, the County failed to provide notice for that year.

The issue as to that year, then, includes a determination of whether that procedural error alone should warrant reimbursement. *See, e.g., Jaynes, supra.*

sented by the County's attorney, the parents' counsel argued:

> [Y]ou have to keep in mind that C[M] started in the school's [TEACCH] program back in 1993. She spent three months in that program. It was after those three months that the parents determined that she was not making reasonable progress and pulled her out to try this new educational program that they had researched and discovered. They then continued doing this for a full year. . . . They moved to North Carolina because of a TEACCH program and they'd read about TEACCH and TEACCH is very well renowned throughout the nation. And they put their child in a TEACCH class and she's still not learning and they're concerned and trying to figure out, "What do we do about this? How do we deal with this," and they come up with an alternative: *"Well, maybe we'll try this program out of California [Lovaas] and see if that works. We can't ask the school system, you know, willy-nilly, just to come in here and pay for this program. We have to test it."* And they go out and establish the program themselves.

*Id.,* at 124–25 (emphasis added).

Based on such admissions and the parents' failure to present any evidence in opposition to the County's motion for summary judgment, the ALJ ruled in the County's favor for the 1993–94 and 1994–95 school years. Order Granting Partial Summary Judgment, filed March 24, 1997, *included in* Section II of the Administrative Record.

Realizing his mistake, counsel moved to reconsider the ruling and submitted the affidavits not previously provided to the Court or opposing counsel.[10] In pleadings before this Court, Plaintiffs' counsel acknowledged that an IEP meeting was conducted in February 1994 and that an IEP was prepared which increased the hours of speech therapy and continued in effect the provisions of the 1993–94 IEP.[11] See, Plaintiffs' Motion to Set Aside Partial Summary Judgment, filed August 21, 1998, at 3. Indeed, in the Petition for a Contested Case Hearing, the parents' attorney advised that in December 1994, JM suggested that the County "might share the expense of C[M]'s program *from that point forward.*" Petition for a Contested Case Hearing, filed November 1, 1996, *included in* Section I of the Administrative Record, at 3–4 (emphasis added).

The ALJ's grant of summary judgment in the face of counsel's admission that he had no evidence to support his position was not erroneous. Likewise, his refusal to reconsider was not erroneous based on the evidence submitted by the parents. Both counsel and JM acknowledged they had no complaint with the initial IEP prepared for CM or with the IEP providing for additional speech therapy. The record before this Court is devoid of any complaint to the County for the 1993–94 or 1994–95 school years. Indeed, no allegation has been made that a due process notice should have been provided to the parents in each of those years.[12] Thus, the ALJ had before him an IEP which had been approved by the parents and no evi-

---

**10.** The ALJ denied the motion to reconsider. In this action, Plaintiffs' attorney moved to set aside that ruling and provided the same affidavits.

**11.** The Court thus rejects counsel's argument that no IEP was ever prepared for CM for the 1994–95 school year.

**12.** In both the administrative proceedings and this action, the parties focused their attention on the 1995–96 school year.

dence that they were challenging it. Although in December 1994 the parents asked for contribution towards Lovaas therapy from that time forward, they still made no complaint about the IEP itself. And, as soon as JM mentioned the prospect of future contribution, a meeting was scheduled by Judy Cook to discuss the same. As the Circuit noted in its opinion, states are required to provide due process notice "if parents of a disabled child and an educational agency *disagree as to the appropriateness of an IEP* or a question of financial responsibility...." *CM,* 241 F.3d at 376. ALJ Mann aptly noted that the school system could not provide due process notice to parents who were not "aggrieved" by the school's action. Order Granting Partial Summary Judgment, filed March 24, 1997, *included in* Section III of the Administrative Record. The Fourth Circuit reiterated this in the *CM* opinion: "Under North Carolina law, the 60–day limitations period only commences 'when notice is given of the agency decision *to all persons aggrieved who are known to the agency.'*" *CM,* 241 F.3d at 383 (quoting N.C. Gen.Stat. § 150B–23(f)) (emphasis added). In other words, because the parents unilaterally withdrew the child from the County system at a time when there was no dispute pending, nothing triggered the "due process" notice required by the North Carolina statute.

Nor is a different conclusion mandated by the IDEA. That statute requires written notice to the parents of a child when the school "proposes to initiate or change or refuses to initiate or change the identification, evaluation, or educational placement of the child ... or the provision of a free appropriate public education to the child...." 20 U.S.C. § 1415(b)(3). Here, the only changes were the withdrawal of the child from school by the parents and their request for additional speech therapy which was granted. In the absence of any complaint by the parents until December 1994, the County can hardly be faulted for failing to provide due process notice. *See, e.g., T.S. v. Independent Sch. Dist. No. 54,* 265 F.3d 1090 (10th Cir.2001) (Where there is no claim that a FAPE was not given, any procedural defect is not actionable under the IDEA.); *Costello v. Mitchell Pub. Sch. Dist. 79,* 266 F.3d 916 (8th Cir.2001) (Despite repeated requests by the school for current medical evaluations, parents failed to provide the information necessary for an evaluation. Thus, any failure to give due process notice did not result in an IDEA violation.); *James v. Upper Arlington City Sch. Dist.,* 228 F.3d 764, 768 (6th Cir.2000), *cert. denied,* 532 U.S. 995, 121 S.Ct. 1655, 149 L.Ed.2d 637 (2001) ("The district can perhaps be excused for taking no action during 1989–94, when apparently the child was being educated to his parents' satisfaction without input from the school district."); *Gadsby v. Grasmick,* 109 F.3d 940, 956 (4th Cir.1997) (No reimbursement available for private placement where violation of IDEA notice requirement did not affect development of child's IEP or provision of FAPE.).

The parents, therefore, have not met the burden of proof to show that the County was obligated to provide due process notice and no procedural error occurred in the 1993–94 or 1994–95 school years. *Brian S. v. Vance,* 86 F.Supp.2d 538 (D.Md. 2000) (Where an existing IEP was previously agreed to by all parties, parents bear the burden of proof at the administrative level.); *Barnett,* 927 F.2d at 152 (burden of establishing a violation of the IDEA falls on the party challenging the administrative findings); *Tice v. Botetourt County Sch. Bd.,* 908 F.2d 1200, 1206 n. 5 (4th Cir.1990) (At the district court level, the party seeking to challenge the administrative ruling has the burden of proof.).

The Circuit has held that no due process notice was provided for the 1995–96 school

year. Thus, the issue as to that year is whether this procedural violation alone should entitle the Plaintiffs to reimbursement. The undersigned concludes that it does not. Plaintiffs did not receive a notice definitively stating that their 60–day period within which to file for a due process hearing had begun to run as of a specific date. However, they did receive a parents' handbook in which all of their procedural rights were explained. Moreover, Plaintiffs have never contended they were not advised of their right to a contested hearing; their contention was that they were not advised of the date when the time to assert that right began to run. Thus, this action could not be time-barred. On this contention, the Circuit agreed.

■ Without more, this procedural violation does not result in a duty for the County to reimburse the Plaintiffs for that school year. *Gadsby*, 109 F.3d at 956; *Board of Educ. of Frederick Co., Md. v. JD, III*, 232 F.3d 886 (table), 2000 WL 1595710 (4th Cir.2000). In the absence of repeated violations of parents' procedural rights, a procedural deficiency must result in the loss of an educational opportunity for the child in order to warrant reimbursement. *See, e.g., Jaynes, supra; Tice, supra.* Whether such a loss occurred will depend on whether a FAPE was offered to CM for that school year, an issue discussed below.

■ To summarize, no due process notice was required for the 1993–94 or 1994–95 school years. For the 1995–96 school year, no due process notice was provided; however, this procedural violation is not compelling unless the County failed to offer CM a FAPE for that year. Thus, the Plaintiffs are not entitled to reimbursement for any of the three school years unless the County's IEP for each year at

issue would *not* have provided CM with a FAPE *and* the alternative placement of Lovaas therapy was proper under IDEA. *Jaynes,* 13 Fed.Appx. at 172. As noted *infra,* the Plaintiffs consented to CM's placement, as provided by the 1993–94 IEP, and have at no point revoked that consent.[13] Indeed, no mention was made of the 1993–94 and 1994–95 school years until the November 1996 petition for a contested hearing was filed. Therefore, their attempt to claim that a FAPE was not provided cannot stand. 34 C.F.R. § 300.500(b)(1)(iii) ("The parent understands that the granting of consent is voluntary on the part of the parent and may be revoked at anytime. If a parent revokes consent, that revocation is not retroactive (*i.e.,* it does not negate an action that has occurred after the consent was given and before the consent was revoked").).

■ Moreover, although the Plaintiffs have alleged in boilerplate that the County failed to provide a FAPE to CM in the 1993–94 and 1994–95 school years, they have presented no evidence or argument in support of these vague claims. In fact, as to the 1993–94 school year, Plaintiffs' moved to North Carolina precisely for the TEACCH program offered through the State's schools. It is therefore not surprising that no complaint about the IEP was registered. To the contrary, the evidence showed that the parents were pleased with the TEACCH approach but wanted to obtain faster results and thought that Lovaas might do so. Likewise, the 1994–95 IEP was satisfactory to the child's parents; they asked for and received additional speech therapy at County expense. *CM,* 241 F.3d at 381 ("[T]he IDEA requires school authorities

---

**13.** The Court is uncertain whether the Circuit remand included a directive to consider whether a FAPE was provided for these school years. Out of an abundance of caution, and in an effort to prevent additional litigation, the issue will be addressed.

to supply detailed written notice whenever they propose or refuse to initiate or change the identification, evaluation, or placement of a child."). The undersigned therefore concludes that the IEP for the 1993–94 and 1994–95 school years would have provided CM with a FAPE.[14] *Brett Y.*, 1998 WL 390553, at **10–11 (quoting *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir.1993) (IDEA requires "an adequate, rather than an optimal, IEP" and noting parents' agreement at IEP development meeting that the goals were appropriate.)); *Doe v. Defendant I*, 898 F.2d 1186, 1190–91 (6th Cir.1990) (Where the information claimed to be absent from the IEP was known to all parties, technical violation was harmless.); *JSK By and Through JK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1571 (11th Cir.1991) (Argument that the IEP failed to include teacher's daily activities and thus ambiguous, rejected.).

In addition, the parents' unilateral withdrawal of CM from the school impacts their claim for reimbursement.

By unilaterally withdrawing their student from public school and requesting a due process hearing, parents assume a double risk. First, they assume the risk that their child's IEP will be found adequate, thus precluding their reimbursement. Second, they assume the risk that though their child's IEP was inadequate, the alternative placement they chose for their child will not be deemed an adequate education either, thus precluding their reimbursement. As noted[ ], the Supreme Court has determined that parents are entitled to assume such a risk and proceed in such a

manner. *Parents are not entitled, however, to delay a request for a due process hearing, incur tuition costs of their own choosing for several years (thus depriving the school district of a chance to fashion a less expensive acceptable alternative), and then ask the school district to fund whatever alternative they have pursued in the interim.*

*James,* 228 F.3d at 769 (emphasis added). This is precisely the case at hand. Having given the County no indication of dissatisfaction, the parents unilaterally determined that Lovaas therapy was superior to the TEACCH methodology after only a three month trial of the very system for which they had made a major interstate move. *Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 84 (3rd Cir.1999) ("[W]hen parents unilaterally withdraw their children from public school, absent mitigating circumstances, they are not entitled to reimbursement for private school tuition until they request review proceedings.").

[A] parent's right to seek reimbursement for a unilateral placement of their child is available only upon a finding that, *after cooperating with the school district,* there are "sufficiently serious procedural failures by the school district." ... Practically speaking, a school board needs the cooperation of the parent(s) to properly evaluate a child and convene a case conference to thereby determine what level of services would address the child's disability.... [The County] had no opportunity to provide an appropriate education for [CM] in the public school as is preferred under IDEA because [her parents] trans-

---

14. The IEP met the standards of the IDEA as well. As discussed *infra,* it was a written statement for CM developed at a meeting between school officials and the parents which included a statement of her present levels of education performance, a statement of annual goals and "a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs." 20 U.S.C. § 1401(a)(20).

ferred [her] to private [therapy] after only [three months in the TEACCH program] *without any discussion* with [County] officials about possible accommodations to meet [her] current needs.... [CM's] unilateral withdrawal from [the County system] meant there was no opportunity to modify [her] IEP to meet [her] needs for the [1993–94 and 1994–95] school year[s] in public school as is preferred under IDEA and *no involvement of school officials in the private placement decision.* In these circumstances reimbursement for the expenses of [her] private education is not required even if it were assumed that private placement was appropriate to meet [her] needs.

*Patricia P. v. Board of Educ. of Oak Park,* 203 F.3d 462, 468 (7th Cir.2000) (emphasis added) (citations omitted). In fact, the November 1993 TEACCH evaluation showed that in the three months CM was in the program, her mental age increased by 17 months.

▇ Likewise, the Plaintiffs seek reimbursement for Lovaas therapy, a methodology which they unilaterally chose during a time when there were no proceedings pending with the County. "Recovering tuition [or costs] is a remedy only if the free and appropriate public education [ ] guarantee has been violated, exhaustive administrative remedies have been tried before placement, *and the school has been notified....* While [the private school] may have been of great benefit to [the child], we cannot agree that a school district must reimburse a parent for unchecked educational expenses." *Thompson v. Board of Special Sch. Dist.,* 144 F.3d 574, 579 n. 3 (8th Cir.1998) (emphasis added) (citations omitted); *accord, Sandler v. Hickey,* 5 Fed.Appx. 233, 236 (4th Cir.2001) ("[P]arents who enroll their children in nonpublic school without affording the local school system an opportunity to provide a FAPE in a timely fashion will not be entitled to

reimbursement."); *Schoenfeld v. Parkway Sch. Dist.,* 138 F.3d 379, 382 (8th Cir.1998); *Patricia P., supra; Lewisville Independent School Dist. v. Brooke P.,* 16 Educ. for the Handicapped Law Rep. 1313, 1315–16 (E.D.Tex.1990) (parents' failure to request due process hearing constitutes waiver of right to reimbursement for cost of extended school year services prior to initiation of due process proceedings). The undersigned therefore concludes that the parents are not entitled to reimbursement for the 1993–94 or 1994–95 school years.

Inherent in the Circuit's ruling that the Plaintiffs' claims for the 1995–96 school year were not time-barred is a directive that the undersigned determine whether a FAPE was offered during that year. When JM requested in December 1994 that the County contribute toward the cost of Lovaas therapy, school authorities scheduled an IEP review meeting for January 1995. In fact, a series of meetings were held in January and February 1995 to develop an IEP for CM. *See* Testimony of Candy Priest, Transcript Vol. XI, at 145–46. At one of those meetings, the parents submitted their own draft of an IEP which provided for Lovaas therapy at the school through a Lovaas trained teacher's aide. The final IEP proposed by the County would have placed CM in the self-contained autistic classroom at Bruce Drysdale Elementary for 20 hours per week with main-streaming into regular classrooms, resources in the regular school program, such as library and physical education, occupational therapy for 30 minutes per week and speech therapy for 2 hours per week.

[T]he IDEA[ ] recogni[zes] that federal courts cannot run local schools. Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these edu-

cators of the right to apply their professional judgment. Rather it establishes a "basic floor of opportunity" for every handicapped child. States must provide specialized instruction and related services "sufficient to confer some educational benefit upon the handicapped child," but the Act does not require "the furnishing of every special service necessary to maximize each handicapped child's potential." .

*Hartmann,* 118 F.3d at 1001 (quoting *Rowley,* 458 U.S. at 199–201, 102 S.Ct. 3034).

In fact, a review of the notes kept by CM's Lovaas therapists for the 1995–96 school year shows not only that the County offered CM a FAPE but also that enrollment in the TEACCH program may have been more beneficial to the child. The Plaintiffs were adamant that CM not be placed with other autistic children and failed to advise her teachers in the private pre-school that she was autistic. They were concerned that CM would imitate the behavior of other autistic children and thus regress. However, throughout the time period at issue, CM continued to exhibit tantrumming, a behavior which the County's teacher, Ms. McDanel, testified was not present in her classroom. *See, e.g.,* Testimony of Virginia Dillworth, Transcript Vol. XIV, at 222–36 (CM's tantrums at school were a continuing problem from the fall of 1995 through March 1996 despite several methods used to resolve them.). Her behavior not only frightened the other children but made them unwilling to approach CM for interaction. *Id.* The behavioral problems had escalated in January 1996 to the point that Dillworth was worried CM would be expelled from the school. *Id.,* at 238. Even at the end of March 1996, Dillworth had to remove CM from the classroom for tantrums, on one day three times before 10:00 in the morning. *Id.,* at 244. Even in May 1996, CM had a ten minute tantrum at school.·

*Id.,* at 253. Her therapists frequently described CM as lazy, meaning that she was performing at only 75 percent of her ability. *Id.,* at 245–53. The solution was to use more prompting and drills. *Id.* And, she continued to engage in self-stimulation.

Ms. McDanel testified that autistic children do not engage in behavior problems because they are lazy but because something is wrong which they are unable to communicate. The behavior itself is the beginning of communication and the teacher must use pictures to help the child express herself. As soon as the child is able to communicate, the behavior improves. All of the experts testified that autistic children engage in inappropriate behavior as a means of communicating that something is wrong, *i.e.,* the child is tired, frustrated, sick, hungry, or having too much expected of her. *See generally,* Testimony of Laurie McDanel, Transcript Vol. X, *supra.* Yet three years into the program, CM continued to have tantrums.

The County's experts and teachers noted the Lovaas program concentrated on behavior modification and rote learning to the exclusion of developing spontaneous language skills. Her therapists consistently reported during the 1995–96 school year that CM continued to have problems with spontaneous language in the school setting, especially with other children. And, it ·was noted as late as the 1996–97 school year that CM was still dependent on her Lovaas therapist who continued to attend each school day with her. Her therapists also frequently attended social functions with her. The County's teachers and experts testified that, first and foremost, autistic children need a structured environment in which they feel secure before learning is imposed on them. And, once this is accomplished, independence is the ultimate goal so that the child can function in the real world. The IEP was designed

to give CM the opportunity to do both: she would be in the structured classroom for academic instruction with time in a regular classroom.

In the summer of 1996, CM's parents had her evaluated by Dr. Thomas Boyle. They did not agree with his conclusions that

she showed significant deficits in expressive and receptive language, and relative strengths in nonverbal cognitive abilities, such as visual-spatial problem-solving skills. Academic testing at that time indicated that, in the area of reading skills, C[M] was able to recognize letters, decode some two-letter words, and associate letters with sound. In regard to arithmetic skills, C[M] was able to count objects, recognize numbers, and demonstrate understanding of some relational concepts (*e.g.*, size). In the area of writing skills, C[M] was able was able to copy and trace, write her name, write letters, and spell some simple words. Overall, her academic skills were approximately at the kindergarten level.

Defendants' Exhibit 61, Psychological Examination by Thomas Boyle, Ph.D., at 1. They asked him to reevaluate her in February 1997 at which time he noted that as "in July, C[M]'s attending skills were variable, and were largely depended on her ability to do the tasks. She required prompting and encouragement in order to maintain her cooperation, and task directions had to be simplified when possible." *Id.*, at 6. Overall, Dr. Boyle "believe[d] that the recommendations I provided in my report of 7/29/96 are still appropriate for C[M]. Educational intervention for C[M] should particularly address her language comprehension difficulties." *Id.*, at 7.

Of course, there is no evidence that CM would have prospered in the TEACCH setting because she was not exposed to it. However, it is clear that her parents have, understandably, acted with some sense of desperation. After three months in the TEACCH program in 1993, they removed CM for the Lovaas therapy, a program described as achieving recovery before kindergarten. While CM made great progress, it is undisputed that she did not reach that goal. When CM was placed in a private preschool, no one was told she was autistic. Dr. Boyle was instructed to remove her IQ, which disclosed mild retardation, from his evaluation for the County. Nonetheless, the County did everything within reasonable limits to accommodate the parents; they offered to provide services in CM's private preschool, provided speech therapy throughout the time period of litigation, and reimbursed them for a portion of an independent educational evaluation.

"The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education ...." *Lenn*, 998 F.2d at 1086. "The IDEA does not require, however, that a school system fund the best possible placement for a child. The [IDEA] requires only that the child be able to benefit from the instruction that [she] receives, not that [she] be able to maximize [her] potential commensurate with the opportunity provided nonhandicapped children." *Brett Y.*, 1998 WL 390553, at *14 (citations omitted). Nor does the IDEA create a cause of action for educational malpractice. *Sellers*, 141 F.3d at 527. The fact that the Lovaas program may be better than TEACCH or provide the maximum opportunity for CM's development does not mean that the IEP offered would not have provided a FAPE. The undersigned therefore concludes that a FAPE was offered to CM for the 1995–96 school year and the Plaintiffs are not entitled to reimbursement.

Plaintiffs also alleged a claim pursuant to N.C. Gen.Stat. § 115C–106(b) which provides in pertinent part that it is the "policy of the State [ ] to provide a free appropriate publicly supported education to every child with special needs. The purpose of this Article is to ... bring State law, regulations and practice into conformity with relevant federal law." The language of the statute indicates that the standard for such an education should be the same as the federal standard under the IDEA. However, "North Carolina apparently does require more than the [IDEA]. The special education program must provide the child with an equal opportunity to learn if that is reasonably possible, ensuring that the child has an opportunity to reach her full potential commensurate with the opportunity given other children." *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 983 (4th Cir.1990). Nonetheless, this higher standard does not require a school district to develop a "utopian educational program" for the student with special needs any more so than would be required if the student were not handicapped. *Harrell v. Wilson County Sch.*, 58 N.C.App. 260, 265, 293 S.E.2d 687, 691 (1982). To the extent reasonably possible, the student with special needs should be given an equal opportunity to learn. *Id.* The Court finds that the Plaintiffs were offered an educational program which would have provided CM an equal opportunity to reach her full potential commensurate with the opportunity given other children. Indeed, it may well be that the TEACCH program would have provided a superior model for CM's emotional and social development.

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiffs' complaint is dismissed in its entirety with prejudice by way of Judgment filed herewith.